## CLARK *vs.* CITY OF JANESVILLE.

### APPEAL FROM CIRCUIT COURT, ROCK COUNTY.

Heard October 19, 1859.]                    [Decided January 4, 1860.

*Corporations—Constitutional Law—Assignments—Coupons—Construction of Statutes—Publication of Laws.*

The courts will construe statutes, as all written instruments are construed, by the surrounding circumstances, the condition of things, the evils to be remedied, and the objects to be obtained. Beyond these they will not go.

Where the charter of a city empowered the common council, by an ordinance, to submit to the voters of the city, the question whether the city should subscribe for stock in a railroad, and issue its bonds, and that ordinances be published before taking effect, &c.; and the ordinance authorizing the submission and the notice of the election, were both contained in the same newspaper; held, that such notice was legally published.

Where a city had issued bonds, with coupons attached, which had passed into the hands of *bona fide* purchasers for value, the city cannot defeat an action on the coupons, by showing that the election authorizing the issuing of them, was not regular.

Bonds, with coupons attached, issued by a corporation, are intended to be thrown into the market and sold, and it would be an inequitable rule to hold that they were void in the hands of a *bona fide* purchaser, on account of some defect in the notice of election, or some slight irregularity in conducting the same (per COLE, J.)

Where the right of the common council to authorize the mayor of a city to subscribe for stock in a railroad company, depended on a vote of the electors of the city, and the bonds are issued, the presumption is, that the city authorities proceeded according to, and complied with all the provisions of law. (Per COLE, J.

The bonds issued by the city of Janesville, were made payable to the railroad company or its assigns, and the coupons attached were payable to the railroad or bearer; and the bonds were assigned to ——— or bearer, and sold by the railroad. These securities are designed to be thrown upon the market for sale, to raise money upon, to pass from hand to hand by delivery, and by common usage are so passed; and, though they are not, strictly speaking, commercial paper, like bill of exchange, &c., yet they circulate in market much like these instruments, and are intended to answer the same purpose; therefore, being transferred by assignment and delivery, a complete title is conferred upon the

holder, relieved from existing equities, at the time of the assignment between the maker and the assignor. (Per COLE, J.)

A suit may be maintained upon the coupons without the production of the bonds to which they have been attached; but in this case, as the action is brought by the holder and owner of the bonds, he is entitled to recover. (Per COLE, J.)

A statute, authorizing a municipal corporation to issue bonds, &c., is a public law; and a purchaser of such bonds is bound to see that the authority to issue them existed; but though the exercise of the power is made to depend upon an election, he is not bound to inquire into the regularity of the election. He may presume that the preliminary steps have been taken according to law; nor is he bound to inquire into the existence and regularity of those steps.

The rule that parties dealing with officers of corporations are bound to know that they have authority to act, though proper for the protection of those whom the officers represent, is not to be carried so far as to destroy the safety and rights of those who with good faith and due diligence deal with the corporation.

Where the act, in pursuance of which bonds are issued by a city, is a public statute, the person dealing in them is chargeable with knowledge of the existence of the act. If it appears that the act has not been published, and is not in force, the authority to issue the bonds does not exist.

If a city is authorized to subscribe for stock of a railroad company, and issue its bonds to the company for the stock, it cannot defeat an action on the bonds, on the ground that the company's charter did not authorize it to receive the bonds in payment for stock. The power to issue the bonds for the stock, carries with it the incidental power to receive them by the company, and issue the stock therefor, without an express authority in the company's charter for that purpose.

Though the charter of a railroad company only authorized it to receive subscriptions to its stock, upon installments payable at call, yet if a municipal corporation is afterwards authorized to subscribe for the stock of the company by a loan of its credit, the railroad company thereby becomes authorized to receive the loan, and the act allowing the subscription, works a modification of the railroad charter to that extent. (Per COLE, J.)

Sections 3 and 10, Art. VIII., of the constitution of Wisconsin, which provides that "the credit of the state shall never be given or loaned in aid of any individual association or corporation," and that "the state shall never contract any debt for works of internal improvement, nor be a party in carrying on such work," &c., are limitations upon the power of the state itself, and not a prohibition upon the legislature to authorize counties, towns, and cities, to loan their credit, or contract debts for works of internal improvement.

Section 3, Art. XI., of the constitution of Wisconsin, expressly recognizes the power of municipal corporations to loan their credit, and requires the legislature to restrict it.

The constitution did not intend to prohibit the legislature from allowing counties, towns and cities to loan their credit to works of internal improvement, but to

permit that power to be exercised under such restrictions as to the legislature might seem proper. (Per COLE, J.)

The legislature authorized the mayor of the city of Janesville, to subscribe $150,000 for stock in any railroad running to, or passing through the city. If the common council should submit the question whether the stock should be taken to the electors of the city, and a majority should vote in favor of the subscription, and then the council should pass a resolution that the mayor might subscribe, &c. These provisions are sufficient restrictions under the constitution upon the power of the city to loan its credit for works of internal improvement. (Per COLE, J.)

The object of the prohibition in section 10, Art. VIII,, of the constitution of Wisconsin, against the state contracting any debt for werks of internal improvement, or being a party to carrying them on, does not require counties, towns, and cities to be included in the prohibition. It was to prevent the state from becoming a party to them, not to prohibit the works from being carried on.

The prohibitions in Art. VIII. of the constitution of the state of Wisconsin, were not designed to protect the citizens of the state from taxation, for purposes of internal improvement, but to prevent the state from being a party to such works.

The constitution gives the power to the legislature to adopt such restrictions as may be necessary, to prevent the evils which may result to counties, towns, and cities, if allowed to engage in public works, and tax the citizens therefor. The remedy for abuses under such power is to be found in the wisdom and integrity of the people, not in the restrictions of the constitution.

Section 1, Art. XI., which provides that corporations without banking powers or privileges, may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the object of the corporation cannot be attained under general laws," is not a prohibition against investing a municipal corporation with authority for any purpose.

Whether the construction of a railroad beyond the corporate limits of a city be a municipal purpose or not, is discussed but not decided.

The case of *The State ex rel. Cothren vs. Lean,* 9 Wis.; 279, considered and approved.

The charter of the city of Janesville is a general law, within the provision of Art. VII., § 21, of the constitution of Wisconsin, which requires that "no general law shall be in force until published." The words, "general law" as here used, have the same meaning as *public act,* in the ordinary acceptation, and they are convertable terms. (COLE, J., dissenting.)

The words "general law," in §§ 1 and 4, Art. XI., of the constitution, are clearly used as opposite to *special,* and without any design of indicating the public or private character of the law. The whole object and scope of the restriction are aimed at special legislation. (COLE, J., dissenting.)

In § 21, Art. VII., the words " general law," are not used as contra–distinguished. from local or "special," but they are used in their usual meaning of public. COLE, J., dissenting.)

The object of § 21, Art. VII., was to protect the people from the effect of laws which they had no means of knowing, and yet are bound to take notice of.

Laws are public or private, not because of convenience in pleading them, or because courts take notice of them; courts and every body else are bound to take notice of certain laws, because they are public.

The charter of the city of Janesville is a general law, within the provision of Art. VII., § 21, of the constitution, and was not in force until published under and by authority of law. (COLE, J., dissenting.)

A publication of an enactment of the legislature in an unauthorized manner, although it may give notice to the people to be affected thereby, is not such a publication as is required by the constitution to give it efficacy.

The charter of the city of Janesville, authorizing a vote to be taken on the question of issuing bonds to aid in the construction of a railroad, was published in the private acts, and the certificate of publication attached to the volume was dated October 4, 1853; held that the charter was first published by authority at the date of the certificate, and that it did not authorize the common council to pass an ordinance, and the people to vote on the question in July, nor the counsel to issue the bonds in August, previous to the authoritative publication. Every person taking these bonds, is chargeable with a knowledge of this want of authority. (COLE, J., dissenting.)

This was an action commenced by Clark against the city of Janesville, to recover the amount due upon a city bond, and the coupons attached. The judgment from which the appeal was taken, was entered upon over-ruling the demurrer to the complaint.

After averring that the city was a municipal corporation, duly incorporated, and that the Rock River Valley Union Railroad Company was a body corporate and politic, duly organized, the complaint set forth, that on the 18th of June, 1853, the common council of the city passed an ordinance, providing for the submission of the question, whether the city of Janesville shall take stock to the amount of $150,000, in the R. R. V. R. R. Co. The ordinance provided that the election should take place on the 5th of July, 1853, prescribed the form of the ballot, the inspectors of the election, the canvass and return of the election, and places of the election, and also for the publication of the ordinance. On the 22d of June the ordinance and notice of the election were published in a newspaper of the city. This was done in pursuance to the provisions of sec. 7, chap. 4, of the "Act to incorporate the city of Janesville," approved March 19, 1853. That upon the submission of the question to the electors, a majority of the votes were cast in favor of taking the stock; and that on

the 9th of July, the common council, by resolution entered in their minutes, authorized, directed and instructed the mayor of the city to subscribe for $150,000 of the stock of the railroad company, pursuant to the act. On the 10th of July the mayor subscribed for the city, in the stock book of the company, the $150,000. On the 1st of August, 1853, the common council issued 70 bonds of the city, with coupons attached, drawing ten per cent. interest, to pay for the stock so subscribed. The following is a copy of one of these bonds, and of the coupons attached:

*State of Wisconsin.   United States of America.   Janesville, July 1st, 1853.*

$1,000                                                  No. 1.
JANESVILLE CITY SCRIP.

This certifies that the city of Janesville is indebted to the Rock River Valley Union Railroad Company on the principal sum of one thousand dollars, payable to said company or its assigns, at the end of twenty years from the 1st day of July, in the year one thousand eight hundred and fifty-three, with interest at the rate of eight per cent. per annum, payable semi-annually in the city of New York, on delivery of the interest warrants hereto annexed, as they shall respectively become payable, until said principal sum is fully paid.

In testimony whereof, and pursuant to a vote of the common council and citizens of the city of Janesville, in a city meeting duly notified and held for that purpose, I, A. Hyatt Smith, mayor of said city, hereunto subscribe my name and cause the seal of said city to be affixed.

Dated at Janesville, July 1st, 1853.

Subscribed and sealed this 1st day of August, 1853.

[L. S.]                          A. HYATT SMITH, Mayor.
          Countersigned by
               J. W. HOBSON, Treasurer.

Registered in the office of the city clerk, this 16th day of August, 1853.          JAS. H. OGILVIE, City Clerk.

For value received, the Rock River Union Valley Railroad Company assign the above bond to ———, or bearer, and promise that the interest and principal sum thereof shall be paid in the city of New York on the surrendering of the annexed interest warrants and of said bond, as they respectively become payable.

In testimony whereof, said company have caused their seal and the signature of their president to be hereto affixed at their office in Janesville, this first day of August, A. D., 1853.

[L. S.]                          A. HYATT SMITH, President.

No. 2.          Interest Warrant for forty dollars, ($40.)

On the 1st day of July, 1854, the city of Janesville, Wis., will owe and will pay to the Rock River Valley Union Railroad Company, or bearer, forty dollars, being for the half yearly interest on city certificate No. 1, for one thousand dollars, payable in the city of New York.

J. W. HOBSON, Treasurer.

The complaint then averred these bonds were duly delivered to the railroad company. On the same day, the 1st of August, 1853, the president of the company, A. Hyatt Smith, under the corporate seal of the company, assigned the bonds, numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 50, 61 and 62, with the coupons, to ————, or bearer," and delivered them to the plaintiffs, for value received; and thereby they became and were the owners and holders of the same. That the interest upon the coupons Nos. 2, 3, 4, 5, 6, 7, and 8, attached to each, became due respectively on the 1st of July, 1854, 1st January, 1855, 1st July, 1855, 1st January, 1856, 1st July, 1856, 1st January, 1857, and 1st July, 1857, for forty dollars each, and claimed judgment for the amount, with interest and damages, at ten per cent.

The defendants demurred generally, that the complaint did not contain facts sufficient to constitute a cause of action.

The circuit court overruled the demurrer, and from that order this appeal was taken.

The city of Janesville was incorporated by an act of the legislature of this State, approved March 19, 1853, and was organized under a city government in April of the same year. Section 7, of chap. 4, of the charter is as follows:

" The common council of said city shall have power to submit to the legal voters thereof, the question whether said city shall take stock in any railroad running to or passing through said city, by giving, in some newspaper published in said city, at least ten days notice of the time and place of deciding said question, and stating in such notice the amount to be subscribed. The question shall be decided by ballot, those

in favor of taking stock, voting 'for taking stock,' and those opposed, voting ' against taking stock.' If a majority of the votes cast on such question be in favor of taking stock, then the common council shall, by resolution, to be entered in the city records, authorize the mayor to subscribe for the city, the amount of stock so voted to be taken. When such stock is subscribed, said city shall have the same powers and privileges, and be subject to the same liabilities as other stockholders in such company, excepting only the reservations and agreements made by said common council, with the directors of such railroad company.

" Sec. 9. The common council shall have power to issue the bonds of the city, with coupons or interest warrants attached, drawing not more than ten per cent. interest, to pay the stock so subscribed, and shall have power to levy a special tax on the taxable property in said city, to pay the interest on such bonds, and also the principal, when the same may become due; but the common council shall not have power to dispose of such bonds for less than the face thereof.

*J. A. Sleeper*, for the appellant.

The city of Janesville is a municipal corporation, created by law of the legislature of this state, deriving all its power to act from its charter, and can do no legal or binding act unless authorized thereby. The charter gave power to the common council to submit the question of taking stock in any railroad running to or passing through the city, and when, upon a submission of that question, in pursuance with the provisions of its charter, the legal voters in the city, by a majority should determine on taking stock, the council could authorize the mayor to subscribe the stock in behalf of the city. Unless the complaint shows a compliance with the provisions of the charter, upon the subject of taking stock and issuing these bonds, it does not show that they were issued by authority of law, nor that they were binding on the city. The complaint does not show that ten days notice was given of the time and place of deciding the question of taking stock.

1. The ordinance passed by the common council does not fix the place of the submission of the question as required by the charter. There could be but one place in the city where votes were to be cast and received. Or if I am wrong in this, then it is clear that saying that the place of holding

the polls in the 4th ward should be the place of last election, is not fixing a place for deciding the question of taking stock within the meaning of the charter.

2. The notice is equally defective, and for the same reasons as the ordinance.

3. There was no proper publication of the notice, for the reason that the ordinance directing the publication of the notice was not in force until after it had been published, and until it was published was no authority for the clerk to publish the notice. Sec 4, chap. 4, of the charter. The allegation in the complaint is: "Which ordinance was duly published on or about the 22d day of June, 1853, in the Democratic Standard, then the official paper of the city of Janesville. That afterwards, and on or about the said 22d day of June, 1853, the said common council did, in pursuance of the aforesaid ordinance, publish in the Democratic Standard, a newspaper published in said city, a notice, &c. Now, it is not certain when the ordinance was published, nor when the notice was published; but it is manifest that they were published on the same day, for the same language is used in reference to both, and as the authority to publish the notice is conferred on the clerk by the ordinance; and that being the only evidence of the action of the common council on the subject, it is apparent that there was no legal publication or giving of notice, because the common council had not as yet authorized it to be given.

4. The complaint does not show that there ever was a vote cast upon the question; it is remarkably silent on that subject. After alleging that by the ordinance and notice the common council submitted the question, it goes on to allege that a majority of the votes cast were in favor of taking stock; but nowhere does the complaint allege that there was an election held, or that the people voted on the question. Saying " that upon the said submission a majority of the votes cast were in favor of taking stock," is not saying any votes were cast upon the question.

Now all these matters are material; they are matters of substance which must appear on the face of the complaint before the court can see that the common council could legally issue the bonds described in the complaint. It is obvious that they could only be issued upon authority given by the legal voters, in the manner prescribed by the charter; and if they had never authorized the subscription of the stock, there

would be no payment to be made for stock, and the railroad company could not, nor did it acquire any interest in the bonds, and could not enforce payment of the amount secured. These bonds are all payable to the R. R. Co., or its assigns, and the plaintiffs took them and hold them subject to all defenses which could be urged against them if they were still held by the railroad company, and are bound to show in their complaint, that they were issued by legal authority, just as much as the R. R. Co. would be bound to, were it plaintiff in this action.

The plaintiffs have failed to show that the preliminary steps required by law, were taken to authorize the subscription to the stock of the railroad company by the city, and consequently, the bonds were issued and delivered by the common council to the railroad company, without any authority, and are void. The railroad company were bound to know the power of the common council to issue these bonds; and in contemplation of law, it did know that it was acting without any power. The president of the railroad company was mayor of the city, and in those capacities, knew for both parties, all there was done in the matter, and his knowledge is binding upon the railroad company.

These bonds are all made payable to the Rock River Valley Union Railroad Company or its assigns; and were delivered to the railroad company, on or about the 1st day of August, 1853, the day when they were actually sealed.

The Rock River Valley Union Railroad Company was incorporated by the name of Madison and Beloit Railroad Company, Laws of 1848, p. 161, and its name changed in 1850, Laws 1850, chap. 219, to "Rock River Valley Union Railroad Company." By the charter of this railroad company, sec. 3, the capital stock of the company is divided into shares of one hundred dollars each, and five dollars are required to be paid on each share at the time of subscribing.

Sec. 6 is as follows: "The directors may receive payment to the subscriptions to the capital stock at such time in such proportion, not exceeding twenty-five per cent. at any one instalment, under such conditions as they shall deem fit, under the penalty of forfeiture of all previous payments thereon, or otherwise: provided, they shall never require the payment to be made at any place out of the counties through which the road shall pass; and such directors shall, at least thirty days previous to the appointed time of such required payment, give no-

tice thereof in the manner provided in the fourth section of this act, for giving notice of the opening of books of subscription for the stock of said company." This section has not been changed, except that the amount of the capital stock has been increased almost indefinitely. The requirement of the payment of five dollars on each share, at the time of subscribing, is still in force, and was a prerequisite, and necessary to be done, when the subscription to the stock of the railroad company was made by the city. All the provisions of section 6, and indeed, every word of the charter, of the company, entered into the contract and became a part of it, and if that contract of subscription in any way conflicted with the charter; if the railroad company entered into any contract with the city, either prohibited or not authorized by its charter, it has exceeded its powers, acted without authority, and as to it, the whole transaction is null and void; and, as there must be mutuality in every contract, it follows if the railroad company was not bound, the city incurred no obligation in subscribing for the stock, nor in delivering its bonds to pay for the stock for which it subscribed, but which it could never hold or possess under the contract, because of the want of power of the railroad company to enter into the contract with the city. These bonds were issued to pay for stock subscribed in the R. R. V. U. R. R. Co., by the city; they are payable to the R. R. Co., or its assigns, in twenty years, in the city of New York; they are upon eight per cent. interest, payable semi-annually in the city of New York, the interest warrants or coupons being payable to bearer. Being issued to pay for stock in that railroad company, and payable and delivered to it, it is obvious that a credit was given by the railroad company to the city for twenty years, upon its subscription to the capital stock of the company, and when that term of credit had expired, the terms of the contract required payment of the whole sum subscribed, and not that only, but required that payment be made in a place out of all the counties through which the road runs; and not only that, but in a foreign state. Nor is that all. This credit was given by the railroad company in consideration that the city would, every six months, pay it, in addition to the one hundred dollars on each share subscribed, four dollars, by which the city, at the end of the time when it was required to complete the payment for the stock subscribed, would have paid for each share subscribed, the sum of two hundred and sixty dollars. This

contract the railroad company, by its charter, was not authorized to make. It had no power to receive subscriptions to its stock under an agreement that it should be paid for in anything but money. It had power to fix the time and the proportions, when and in which, payments to the stock should be made; but it could not require more than twenty-five per cent. to be paid at any one time. Nor could it affix any penalty for non-payment, other than a forfeiture of all previous payments. It could not, as a penalty for non-payment, affix or agree upon the penalty of payment of interest at any rate or at any times, nor could it enter into any contract whatever for the payment of interest upon sums subscribed for stock. It could not dispense with the payment of the five dollars on each share, nor without such payments could or would any person become a legal or valid stockholder in the company. The amount of such payment would render the subscription null and void.

Again, by the spirit, and I think by the letter of the charter of this R. R. Co., all contracts for subscriptions to its capital stock are required to be uniform; stockholders are to stand upon an equal footing with each other; each must be liable to pay for his stock subscribed as often and in the same amounts as every other; and wheresoever that company, in any contracts of subscriptions, has given one stockholder or set of stockholders any advantage over others, either in time of payment for stock subscribed, or in the amount from time to time to be paid, or where it has required payment in any other way or manner, or in any greater amount, from time to time, than prescribed by its charter, it has acted without authority of law, it has violated its charter, and the contracts, not only as to itself, but as to the subscribers to its stock, are absolutely null and void. The bonds of the city are not payment for stock subscribed; they are merely promises to pay; and it is evident that the subscription was made upon the agreement that the sum subscribed should not be paid, in pursuance with the provisions of the third and sixth sections of the charter of the railroad company, as other subscribers were to pay, or might be required to pay; but that it should be paid at the expiration of twenty years, and that as a consideration for the time of payment, the city should pay semi-annual interest, at eight per cent. per annum.

It may be that the city charter had given the power to the city to subscribe for stock in any railroad running to or pass-

Clark vs. City of Janesville.

ing through it, and to issue bonds to pay the stock thus described. And that inasmuch as the city was authorized to become a stockholder in the company, in that way, the railroad company might legally receive the subscription and issue the stock and receive the bonds in payment therefor. If the company had no power to enter into such a contract for subscription to its stock before the passage of the city charter, I do not see how it can be claimed that any such power has been conferred upon the rail road company by any of its provisions. The city charter does not, by any of its terms, refer in any way to this rail road company, nor to it charter; it does not in any way alter or amend it, and I do not think that the power to subscribe and pay for stock by one, is or can be convertable into a power by the other to receive the subscription and agree to receive in payment that which the other is authorized to give. The power to give bonds for stock, by the city, confers no power on the company to exchange or give stock for bonds.

The 9th section of chapter 4 of the city charter, confers the authority on the common council to issue the bonds of the city, with interest warrants or coupons attached, drawing not more than ten per cent. interest, &c. The bonds set out in the complaint draw eight per cent. interest, payable in the city of New York, semi-annually. Is not the proper and only construction to be given to the language employed, that the bonds are to draw interest at a given rate, payable when the principal becomes due, and not annually or semi-annually? It is certain if the bonds in question were in the exact language of the statute, the interest would be payable when the principal becomes due, and not before. The common council had no power to issue these bonds, and they, as well as the coupons, are void; or, if not wholly void, the promise to pay the interest sooner than the principal is void, and this action cannot be maintained.

The city of Janesville was, at the time when these bonds were issued, a part of the state of Wisconsin, and by the act of incorporation constituted one of its civil division. It could not engage in the business of building railroads, nor subscribe for stock in any railroad company, nor issue its bonds for the purpose of raising money to pay for such stock subscribed, nor deliver them to the railroad company in payment for stock subscribed, had not the Legislature, by express words, conferred upon it that power. It, therefore, becomes an im-

Clark vs. City of Janesville.

portant question in this case, as well as in the state generally, whether, under the constitution of this state, the Legislature has power to confer on municipal corporations, the power either to subscribe for stock in, or loan their credit to these private corporations, for the purpose of aiding them in constructing their lines of roads.

By reference to the constitution, it will be seen that "the credit of the state shall never be given or loaned in aid of any individual, association, or corporation." Sec. 3, Art. 8. Section 10 of the same article, provides that "the state shall never contract any debt for works of internal improvements, or be a party in carrying on such works." These provisions, I think, cover the whole ground, so far as the state itself is concerned; and it becomes material to inquire whether the state may authorize the towns, cities and counties throughout its territorial limits to give or loan their credit to any "individual, association or corporation," or "to contract any debt for works of internal improvement, or be a party in carrying on such works." The words "works of internal improvement," as used in the constitution, have a well known and well understood signification. At the time of the formation of our state government, and the formation of our constitution, the whole country was just recovering from the effect of the universal rage for speculation which had preceded the crash of 1836. We had all around us, in our sister states, examples of bankruptcy and repudiation by states, consequent upon the commencement of canals and railroads, and the contracting of state debts to carry on those works by the state. The states which had attempted to carry on works of internal improvements in their own names as state works, were compelled to suspend; and the consequences which followed were, as ought to have been expected, a depreciation in all kinds of property in the state, and an entire stagnation in all departments of business. Emigration then pouring westward and seeking locations, turned away from them, on account of the burden of taxation which must necessarily be borne, in order to relieve the states from the stigma fixed upon them on account of the spirit of repudiation which ruled their councils. Our people saw all this, and the hardy pioneer who had settled here, that he might not be compelled to pay, or assist in paying state debts, very naturally sought, in forming a constitution for his own state, to put it out of the power of the legislature to burden the people with debt and taxation; and

to that end, following the examples of the states where the constitutions were then being amended, the framers of the constitution set it down therein, that economy was to be a ruling principle in the government. To that end they limit the power of the government to create debts, they prohibit the loaning of the credit of the state to individuals, associations, or corporations; they prohibit the state from creating debts for works of internal improvements, and from being a party in carrying on such works. It is from the history of the times, from the occasion which brought about these limitations of power, from the general understanding of what was then meant by the words internal improvements, schemes of internal improvement, and the like, that we are to arrive at a correct definition or meaning of the words, " works of internal improvements," as used in the constitution; and it is from all these things that we conclude and know that these words signify not the making and repairing of highways by our town authorities; not the improvement of streets in cities and villages, but the building and carrying on of railroads, canals, and the like, forming great continuous highways throughout the length and breadth of the state; and which, uniting with similar works in sister or adjoining states, make up the grand channels of commerce, travel and intercourse. It is admitted that the cases found in the books are to the point, and decide that in the absence of any prohibition in the constitution, the state itself might build railroads and canals, and do any other possible thing; and that being vested with the whole legislative power of the state, might authorise towns, cities and counties in the state to do the same thing; and that the exercise of this power, and action of towns, cities and counties, in pursuance thereof, would not be a violation of the constitutional provision that no person shall be deprived of his property without due process of law, and that private property should not be taken for public use, without just compensation therefor. I shall not in this argument attempt to show that the cases upon this point are or are not erroneously settled; for I think, the question in this case, arising as it does under a constitutional provision, differing from those of the states where the decided cases arose, I may concede the correctness of the *judgment* in these cases, without in the least weakening the position assumed here, that the act of the legislature incorporating the city of Janesville, in so far as it attempts to confer power upon the city to sub-

Clark vs. City of Janesville.

scribe for stock and issue its bonds in payment therefor, is unconstitutional and void. I put this proposition upon the ground that the purposes for which towns, villages, cities and counties are incorporated or organized in this State, are not to build railroads, canals, plank roads, mills, or the like, but are simply those of government; and that inasmuch as the state itself is prohibited by the constitution from taking stock in these railroad companies, from building them itself, and from being a party in carrying on such works, it has no power to authorize towns, villages, cities or counties to do what it is itself prohibited from doing; that that cannot be done indirectly which cannot be done directly. If the state itself were the stockholder, if the bonds were bonds of the state, and if this subscription had been made and these bonds issued, in virtue of a law of the Legislature of the state, the effect would have been to impose upon the people and property of the state the liability to pay for the stock subscribed. And, if after having made this subscription and issued these bonds, the Legislature, under the pretence that the construction of this railroad would be a local benefit to the city of Janesville, had provided by law that the interest and principal on these state bonds should be paid by the city of Janesville, by tax raised in the city, and levied upon and collected from the property in the city, can there be any doubt, that the city could successfully defend against and resist the collection of such a tax? Or suppose the act under which the subscription was made, and the bonds issued, had provided that the stock subscribed should be held by the state for the city of Janesville, and that the bonds issued by the state should be paid by the city of Janesville, and that a tax should be levied to pay both principal and interest; can there be any, the least doubt, that the act itself would have been void, as in conflict with the constitution? Now I think I have shown, or if not, I think it is beyond dispute, that the object, intent, and purpose of the constitutional prohibition, was effectually and forever to prevent the legislature from imposing upon the people and property of the state or of any part of it, a liability to pay debts contracted for any such purpose; to prevent any action being had or taken on the part of the state, and to confine the exercise of all the powers of government; so that in no event, and under no circumstance could or should the people or the property of the state, or any of the people or property of the state be

burdened with such debt, or subject to liability therefor, against or without their consent. The act in question is the act of the state, it is under the power of the state, exercised by the legislative department, that the people of the state in one of the civil divisions thereof, against their will and without their consent are burdened with a debt contracted for works of internal improvement, that they are a party in carrying on such works. The state itself could not by its own direct act burden them with such a debt; it could not in its name, have made them a party in carrying on this work of internal improvement. How can it then delegate a power to a part of the state, to one of its civil divisions, or the people in one of its civil divisions, which it does not itself possess? If it may, then the fundamental law has failed entirely in its object, and the people will have found, too late, that the beast has been wounded in only one of his horns, that only one of his legion of heads has been cut off, and that even the loss of that has not in the least diminished his power. If we are to be confined to the letter of the constitution; if it is not to be construed by its spirit; if it is to be held that these prohibitions are only to the acts of the state in its own name; and that, notwithstanding, the state may not directly by its own act burden the people with debts, contracted for works of internal improvement, nor by and in the name of the state make the people a party in carrying on works of internal improvement, still it may, in the exercise of legislative power, authorize the people of towns, villages, cities, or counties, by the act of majorities, to contract these debts and bind the whole to their payment, and to make the whole a party in carrying on works of internal improvements; then, the constitution, instead of being a shield, is a snare. If the legislative power may be exercised in a case like this, the power may be conferred upon boards of supervisors of towns and counties, trustees of villages and the municipal authorities to contract debts in the name of their respective towns, counties, villages and cities, for works of internal improvement, and make the people of the state within their respective towns, counties, cities and villages a party in carrying on such works, without ever submitting to them the question whether they will or no. This power may be conferred by a general law of the state, and in this indirect way the people of the state, by acts done under the power of the state, may be burdened with debt and taxation, may be a party in carrying on works

of internal improvement as effectually as if there had been no constitutional prohibition. And, further still, if this may be done, why need these civil divisions be restricted in their operations, to railroads running to or passing through the particular locality? Is there any principle or reason which will preclude the legislature from authorizing them to subscribe for stock in any railroad in the state, or in any other corporation, organized for any purpose, which does not apply with equal force to the act under consideration? Indeed I do not see why the legislature might not go further and make it. *obligatory* upon towns, villages, cities, and counties, to become stockholders in railroads and canals, under the pretence of the exercise of the legislative power of the people. In this way, the people who are the state; the state which is the people, would be as effectually overwhelmed with debts contracted for works of internal improvement, would be as deeply involved, as a party in carrying on works of internal improvement, as it could be by the direct action of the government in the name of the state. I maintain that the spirit and intent of those constitutional prohibitions is to limit the exercise of legislative power, so that neither the whole state, nor any one of its civil divisions, any of its constituent parts, shall by any manner of means be able to contract such debts, or be a party in carrying on such works. Give this construction to these prohibitions, carry out the spirit of these limitations, confine the business of making railroads, canals, and the like, to private persons or private corporations, as the framers of the constitution intended should be done, and then, on account of any future transaction, we shall never hear the lament that now on every hand assails our ears from a tax ridden and debt burdened people. We shall hear no more of repudiation by towns, villages and municipalities; there will be no more clamor for the assumption by the state of debts contracted against the will and without the consent of the whole people, and our town, village, city and county governments will confine themselves to the exercise of their legitimate and proper powers, that of carrying on and administering the government within the sphere assigned to each.

*George B. Ely*, for the respondents, argued as to the constitutionality of the act incorporating the city of Janesville, which authorized the city to become a stockholder in railroads running to it. In support of the position that it was

constitutional, he cited Calhoun's works, vol. 1, p. 2-8, Disquisition on Government; id., Discourse on the Constitution and Government of the United States, 161; Constitution of Wisconsin, Art. VIII., §§ 3, 4, and 10; *Slack vs. Maysville and Lexington R. R. Co.*, 13 B., Mon.1; Constitution of Wisconsin, Art. IV., § 22; id. Art. X, § 3; id. Art. XI, § 11; Journal and Debates of Constitutional Convention, 478; 9 Humph., 252; *Scudder vs. The Trenton and Delaware Falls Co.*, Saxton ch. (N. J.), 696; Constitution Wis., Art. XI., § 3; *McCulloch vs. Maryland*, 4 Wheat., 298; *United States vs. Fisher*, 2 Cranch, 328; *Sharpless vs. The Mayor of Philadelphia*, 21 Pa. St., 148; *The Cincinnati R. R. Co. vs. Clinton County*, 1 Ohio State, 77; *Goodwin vs. Crump.*, 8 Leigh, 120; *Bridge vs. Housatonic R. R.*, 15 Conn., 475; *Graham et al. vs. Maddox et al.*, Am. Law Reg., Aug., 1858; *Clark vs. City of Rochester*, 5 Abbott, 107, S.C. 24 Barb.; *Thomas vs. Leland*, 24 Wend., 65; *Mayor of New York vs. Livingston*, 8 id., 110; *People vs. Mayor of Brooklyn*, 4 Coms, 436; *Talbot vs. Dent.*, 9 B. Mon., 526; *Cheeney vs. Hoover*, id., 330; *Clark County vs. The Paris and Winchester Turnpike Co.*, 11 id., 143; Opinion of Hitchcock, C. J., 20 Ohio; *Barto vs. Himrod*, 4 Seldon 483; *Rice vs. Foster*, 4 Harrington, 479; *Moors vs. The City of Reading*, 21 Pa. St., 202; *Vermont Central R. R. Co. vs. Clages*, 21 Verm., 30; *Inhabitants of Upper Alloways Creek vs. Sting et al.*, 5 Halsted, 323; *Milledge vs. Boston Iron Co.*, 5 Cush., 176; *Boisgerard vs. New York Banking Co.*, 2 Sand. Ch., 23; Angell & Ames on Corp., § 206; 3 Bl. Com. 110; *Judges of Oneida Com. Pleas vs. People*, 18 Wend., 79; 2 Bur. Pr., 172.

At this point in the discussion we are met by the decision of this court at the present term, in the case of the *State ex rel. Cothren vs. Laen*, which is claimed to be decisive of this case on a question not raised on the former argument of this cause at the last term of this court.

The legislature, at its session in 1858, passed an act to provide " for the removal of the county seat of Iowa county." This act was not published in the volume of acts for 1858. But after the publication of the volumes of acts for that year it was published about 40 days before the election, in the state paper, and in a newspaper printed in Iowa county. This court decided, 1, that this was a general law within the provisions of § 21 of Art. VII of the Constitution, and could not go into force " until published." 2, that the publication of the

act in a newspaper printed in Iowa county, and in the state paper *after* the publication of the bound volumes of the laws for 1858, was not such a publication as rendered the law operative. The decision covers these points, neither more nor less.

The act incorporating the city of Janesville, under the provisions of which these bonds were issued, was approved March 19th, 1853. It was not published in a newspaper printed at the capitol, but was published in the Janesville Gazette, a newspaper printed at Janesville, April 2d, 1853, and in the Democratic Standard, also printed at Janesville, March 30th, 1853, and was also published in the volume of Private and Local Acts, in October, 1853. This act created the people then inhabiting and those who should thereafter inhabit the district of country described in the act, a municipal corporation by the name of the city of Janesville.

Under the provisions of this act the people residing in Janesville on the 1st day of April, 1853, held an election for city officers, and organized the city government. The mayor and common council at once enacted the great body of ordinances which now obtain in that city; and finally, in July, 1853, three months before the volume of Private and Local Acts for that year were published, and after the body of the ordinances were passed, held an election pursuant to the charter, on the question of issuing these bonds.

This brief statement of facts, it seems to me, shows that there is but little analogy between the two cases, and that the decision of this court on the Iowa county seat question, cannot, by any fair process of deduction, be held applicable to this case. We say the charter of the city of Janesville was a local and not a general act, and if a general act, that it was well published.

Courts usually do and always should stop short at the argument *"ad inconvenienti,"* &c., when they see clearly that a certain line of construction will produce great and irreparable injury to large masses of the people.

The act incorporating the city of Janesville was passed in 1853, and published as above stated. In 1854 two acts were passed amending the charter. In 1855 the charter was further amended by two acts, and again in 1856 by three acts, and again in 1857 by five acts, and again in 1858 by four acts. Three of these were general revisions. It is believed none of these laws were ever published in any manner, ex-

cept in the volumes of Private and Local Laws and in pamphlet form, at Janesville. None of the volumes of Private and Local Laws for these years were published before the month of July, and the volume for 1856 was not published till December of that year. If these are all general laws that could not go into force till published in the state paper or the printed volumes, and if no other publication was sufficient, where does the city of Janesville, and every other city in this State, stand to-day? Three-fourths of the ordinances of all the cities of the state have been passed without authority of law. They have erected bridges and school houses, opened and graded streets, levied and collected taxes, imposed fines and penalties, and administered justice in their municipal courts without legislative sanction, and their officers are liable to actions without number for false imprisonment, for trespass, and for money had and received. And their public services, in behalf of these cities, rendered in good faith, under the sanctions of their oaths of office, will have overwhelmed them with a torrent of misfortunes. And why? Simply because two gentlemen who set in this court have recently discovered that the practice which has obtained in this state ever since the adoption of the constitution in relation to the publication of laws, has been radically defective and wrong, so much so as to render many if not most of the acts of the legislature inoperative for months after they were everywhere, by courts and people, esteemed valid and obligatory.

But let us examine the question further. The constitution provides, sec. 21, Art. VII, that "the legislature shall provide by law for the speedy publication of all statute laws. * * And no general law shall be in force until published."

How are the words "general law" to be construed? Are they the equivalent of "public law?" or rather, are not the words "general law" in the selection above quoted, used in contradistinction from local, and not as the equivalent of public laws. The distinction between public and private acts is well know to the profession. It consists entirely in the rule that courts will take notice of public acts without their being pleaded, while private acts must always be pleaded. Can it be that the able lawyers who were in the convention confounded the word public with the word general, and used the latter word as synonymous with the former? Every general act is necessarily a *public* one. But is every public law a

general one ? The rule is, when a private act is referred to in a public law, the private law thereby becomes a public law, and courts will take judicial notice of it. This rule was recognized in the case of Charles Roger, 2 Greenleaf, 303, cited by this court in the Iowa County Seat case, and also in *Samuel vs. Evans*, 2 T. R., 569. If the legislature were to grant to A. the right to erect a dam across Rock river, no one would doubt its being a private law. If the act, however, contained a provision that it should be a public law, or if a subsequent public law should recognize the franchise, every one would concede this private grant would by either of these things become a public law, of which the courts would take judicial notice. But what a perversion of terms it would be to say that by either of these things this grant of a franchise would become a *general* law. If public laws and general laws are to be held *ex vi termini* to be the same things, what becomes of the distinction between local and private acts on the one hand, and general acts on the other ?

The constitution provides § 18,, Art. IV., that " no private or local bill   *   *   *   shall embrace more than one subject, and that shall be expressed in the title." It has never been questioned but general laws may, nay, general laws very often do, embrace more than one subject. If a law is *general* it cannot be *private or local.* And, if all public laws are " general," what becomes of this wise constitutional restriction on legislative log rolling. The legislature creates a corporation sole or aggregate, or grants a franchise, and, either by a provision incorporated in the act, or by a public act passed the same day, recognizes this private act, which thus becomes a public law by force of a current of uniform legislative and judicial sanction commencing back to a period long before the revolution, and so firmly established that no court could shake it. And if being a public act it was *necessarily* a general law, how could this court pronounce it invalid under § 18 of Art. IV., though it should embrace never so many subjects, should be ever so clearly a log rolling act.

I do not propose to question the decision of this court, that the act providing for removing the county seat of Iowa county is a " general law " within the constitutional provision. I am inclined to think, for the reason assigned in the latter part of the opinion of the court on the question, that the decision is correct. For, as is justly observed, the act did affect

the general administration of the laws of the state in that county, by providing for a change of the place to which all writs and process issued from the courts of Iowa county should be returnable. Nor shall I attempt to lay down any general rule to divide that *terra incognita* which lies between laws which are clearly general and those which are clearly local. To do so would be very difficult, perhaps impossible. Certainly the only safe rule is to say as to such laws, that each case must be decided on its own merits, and the decision should not be a precedent for the determination of any different case.

But, as I understand the reasoning of the first part of the opinion, it does attempt to establish as a general rule, that public are necessarily general laws. I have attempted to show that this rule is incorrect. The court cite as sustaining the rule, which I understand it to have laid down, 9 Greenleaf, 54; 4 Shep., 69; 8 id., 58; 4 Blackf., 236; and 12 Pick., 334. Permit me to say, not one of these decisions support any such rule. They all relate to the question of what is a public law, of which the courts will take judicial notice without their being specially pleaded. We have seen this is a totally different question. The cases in 4 Shep., 69, and 8 Shep., 58, would at first appear not to turn on the question of what is a public statute of which the courts will take judicial notice, but upon examination I think it will be found that was the real question involved.

Most of the acts incorporating railroad and plankroad companies in this state were by the provisions of the charters public laws, and all these charters, by operation of chap. 79 of Rev. Stat., have become such. Yet none of these acts have ever been considered general laws and have not been published as such.

All will concede that those are general laws which affect the people at large or perhaps large districts of the state, and those are local laws which affect only particular localities or communities. Is then the act incorporating the city of Janesville a general law? It clearly is a public one. It affects but one community. It embraces but seven sections of land. It contains only seven square miles of territory and less than ten thousand people. If this is a general law, I should like to learn what is a local law, and the rule by which the one is distinguished from the other. Construe general laws to be only those which operate all over the state, or over a large

portion of the state, and which affect the whole body of the
people of the state, or large classes of the people throughout
the state, and the constitutional provisions requiring them to
be published before they become operative, will be wise and
benificent. For it could not be supposed that the mass of
the people to be affected by such laws inhabiting different
communities and separated by considerable distances, could
know their provisions, until efficient means had been provid-
ed by the state for general dissemination.

That the legislature regarded the charter of Janesville as a
local not a general law, conclusively appears from sec. 14,
chapter 10, of the charter, which provides that "no gen-
eral law of this state contravening the provisions of this act
shall be considered as repealing, amending or modifying the
same, unless such purpose be expressly set forth in such law."
The act also provides that it "shall take effect and be in force
from and after its passage."

The next question is, conceding for the argument that the
city charter is a general law, was it well published as such?
The decision of this court in the Iowa county seat case does
not reach this question. It will readily appear that the cases
are very different. The city charter was published in two
newspapers printed at Janesville, immediately after its passage,
and was some months later published in the bound volumes.
Neither does the reasoning of the opinion contain one word
indicating that the publication of a law in the state paper is a
*sine qua non* to its being operative before the publication of
the bound volumes. Quite the contrary. It says publication
in the state paper, or in a local paper, *after* the publication of
the bound volumes would not be good, but that publication
in the state paper "immediately" after the passage of a law,
would be good. But no where, either inferentially or other-
wise, does the opinion discuss or consider whether any publi-
cation other than in the state paper, and, if any, what pub-
lication "immediately" after the passage of an act would
be sufficient to render the law operative. For aught that
appears in the opinion, the general circulation of a law in a
pamphlet form, or its publication in a considerable num-
ber of the papers of the state, and not in the state pa-
per, would make the law operative. In this I desire to
be understood as referring to the second opinion of the
court in the Iowa county seat case, where the question of
publication was the only one under consideration. I am

aware the majority of this court hold different language in the first opinion in that case, when considering the question whether the non-publication of the law was well pleaded. The court says "it, the petition for mandamus, avers that the act was never published in accordance with the provisions of chap. 6 of General Laws of 1858, or in any other manner known to the law. And we think, in order to give it effect, the publication must be in some manner known to the law. The constitution says that the legislature shall provide for the pulication of laws, and that no general law shall be in force until published. We think the publication mentioned in the last clause is the one required to be provided for in the first, that is, that it must be in pursuance of some law." That so much of the passage above quoted as relates to the manner of publication is mere *dicta*, appears from a consideration of the subject then under discussion. That this court regards it as *obiter dictum*, appears from the second opinion, in which with studious care the court avoid any consideration of what is a sufficient publication. Nevertheless, this *dictum* in a case so recently decided in this court, *obiter* though it be, deserves a careful examination. As I understand it, it is that no publication is good unless made by direction of the state printer, in a paper printed at Madison, or in the bound volumes. The constitution says " the legislature shall provide by law for the speedy publication of all statute laws. * * * And no general law shall be in force until published." Of course the word legislature here used refers to that of the state. And if no general law can go into force except by publication pursuant to a provison made by the legislature, it must follow if the legislature had omitted to prescribe a mode of publication, that no general law could ever become operative, though it should be published in every newspaper in the state, and be brought home to every inhabitant. Nay, if such is the rule, how has any act heretofore passed become operative since the first law providing for the publication of statutes was a general law which could not go in force until published pursuant to a law in force, which the legislature could not by any possibility have provided ? The language of the constitution " that the legislature shall provide for the speedy publication of all statute laws " is only directory to the legislature. There is no means of compelling legislative obedience to it. And can it be possible that the failure of the legislature to comply with

such a provision would defeat the wholesome operation of the constitution by rendering all laws, no matter how generally published, in point of fact, inoperative. What would be the effect of adopting such a rule? The statutes, laws of 1852, chap. 504, laws 1857, chap. 99, laws 1858, chap. 114, provide that " the laws passed at each session of the legislature shall be divided by the Secretary of State and Attorney General into two classes, which shall be published and bound in separate volumes. The first class shall include the laws of a general nature, joint resolutions and memorials.    *    * The second class shall include all laws required to be published which are not embraced in, and published with the laws composing the first class. The title pages of the respective volumes shall express whether they contain the acts of a general nature, or the private and local acts and charters of incorporated companies."

From this it is self-evident that no general law would, by being published in the volume of Private and Local acts, be published *in the manner* prescribed by law, or in pursuance of any law, for there is no law authorizing general laws to be published with the private and local acts. Yet this court will hardly say that such a publication would be insufficient, since to do so would be to blot out almost every city, village, or or railroad charter in the state, if this court hold such to be general laws. Again, this court has held these acts relative to publishing the laws to be directory. How can this be, if general laws must be " published in pursuance of some law." If these laws are directory, how can they be mandatory, so as to make compliance with their provisions the *sine qua non* of a general law becoming operative?

But these acts were not so much intended to prescribe the mode of publishing the laws as to prescribe the mode of letting the contract for doing the state printing, and the duties of the state printer under his contract. Surely if we are to look for the laws only in the channels which the legislature has provided for their publication, it would be, to use the language of this court, to make the volume of private and local acts to " serve as a snare, and delude men into a false idea of safety." For, if the proposition is correct that the laws must, to be operative, be published "*in pursuance* of some law," then by the volume of general laws, the people are " legally informed that those are the laws, and that there are no other laws by which their rights

may be affected." The statutory provisions are positive and definite that all general laws *shall be* published in the volume of "acts of a general nature," and they are silent as to what shall be the depository to which the people shall look. The provisions made by the legislature for the publication of the general laws, are that they shall be published in a newspaper printed in Madison, and in the bound volumes. As a matter of fact that very large classes of laws of which we are speaking, city charters and the like, never have been printed in the state paper—have only been printed in the volume of Private and Local Laws. But it is manifest, from the Rev. Stat., 1849, chap. 5, and the other provisions on the subject, that the legislature did not intend the people should look *chiefly* to these bound volumes to ascertain what the laws were. Quite the contrary. All these provisions show that the bound volumes were designed to aid the officers of the state in the administration of the law, by providing them with the whole body of legislative enactments in a compact and convenient form. By the Revised Statutes, 1859, the laws were to be distributed only to certain public officers. No provision was made for distribution among the people, except that the State Librarian was authorized to sell to any person one copy of any laws remaining on hand after the distribution among the public officers.

The legislature, in 1852, provided, for the first time, that the general and local laws should be published in separate volumes. In this act it is provided that 8,000 copies of the general, and only 3,000 copies of the local laws should be published, and that these should be distributed among the public officers in the state, but only a part of the officers who were entitled to receive the public acts should be entitled to receive the private and local acts. When we consider these provisions of law, and further, that these bound volumes are never distributed, and are not required by law to be distributed within less than sixty days after the adjournment of the legislature, and that, in fact, they are often not distributed for five or six months after the close of the session, it cannot be presumed that the law-makers ever intended the people should look to these volumes for information as to what the law was. These laws were to be in force always sixty days, often six or seven months before these means for their public dissemination could attain this end.

Clark vs. City of Janesville.

As a matter of fact, the bound volumes of laws are never brought home to the body of the people, and were not intended to be brought home to them. It would be idle to suppose that 8,000, much less that 3,000 copies would or could serve to inform the whole body of the people what the laws are.

This referring to the printed volume as the means provided by the legislature for the dissemination of the laws among the people, is to forget the age in which we live, and to assume that we live in the days of the manuscript "News Letter," which obtained in England in the times of the Tudors and Stuarts; not in the sixth decade of the nineteenth century. Who is there at this day that looks to bound volumes to ascertain the events which are transpiring? The newspaper has become almost the institution of the age; it circulates among all classes of the people, it invades every fireside in the state, disseminating knowledge among the great body of the people of whatever concerns them. It is to this source above all others, to which they look for information; it is the great educator of the people. And to say that the framers of the constitution and our legislators have not intended that the press should be above all others, the medium of instructing the people as to their rights and duties, is to say that they wilfully shut their eyes to the actual condition of things, and refuse to look at the best, nay, the only adequate means for the general dissemination of the laws.

Permit me to say what I think is the true rule of construction as to the publication of the laws. It is asked by the court, *arguendo*, if the publication of a law in a newspaper printed at the capitol the day before it directs an act to be done in a distant part of a state, would be a good publication? Most assuredly not. Neither would the publication of the bound volumes to-day containing a law directing an act to be done on lake Superior to-morrow, and imposing penalties for not doing it, be a good publication. Publication must be adequate to the end in view—must be such as will enable the citizens to be affected by the law, to ascertain by reasonable diligence what the law is. Yet the *dictum* of the court necessarily leads us to the conclusion that a law becomes operative the instant it is published in a paper printed at the capitol, or in the bound volumes. This one view must establish that the court has mistaken the true rule. It is easy to say in most cases what is and what is not a good publication; yet extremely

difficult to indicate the line which shall always correctly distinguish the good from the insufficient publication. The line in each case must depend upon the scope of the particular law, and the location of those to be affected by it. The true rule will be found to be, that where the people interested in the law, were actually apprised of its contents, or could by the exercise of ordinary diligence, learn its provisions in time to render it possible for them to obey it, then the law is operative, otherwise not. A literal compliance with the statutory provisions requiring publication in a paper printed at the capitol, would not *necessarily* be such a publication. But ordinarily, publication in a paper printed at Madison, would be good, because such publication would render it probable that the people interested in the law would be apprised of that publication, either by seeing the paper itself, or by seeing the law republished in the local papers circulating among the class or people interested in its provisions.

It is clear, I think, from the statutory provisions already cited, that the publication of the laws in a newspaper printed at the capitol, and their publication in the bound volumes, were not intended to be the *only* means of publication, nor to exclude any other proper mode of publication. These provisions of law were only *directory* to certain officers of the state, prescribing what they should do as state officers towards the dissemination of the laws among the people—not *mandatory*, that the publication prescribed by those laws should be the only publication. Otherwise, if from accident or design these state officers should wholly fail to perform this duty, the will of the people expressed in the constitutional form through the legislature, would necessarily be defeated, and wholesome laws, necessary to the well-being of the people, be inoperative, even though these laws had been published in every paper in the state, except only the one printed at Madison, in which the state printer had directed laws to be published, and by such publication had actually been brought home to every fireside in the state. The assumption that the laws *must* be published in the manner prescribed in the statutes cited, is to leave it exclusively with the state printer to determine what acts of the legislature shall become law. His bankruptcy, his violation of his contract, or his sickness or death, might, either of them, if this rule is to be adopted, defeat the operation of laws of which perhaps every citizen of the state might, by some other publication, have become ap-

prised, when generally the publication directed by these acts, would have utterly failed to attain this end.

An examination of sec. 21, of Art. VII, of the constitution, will confirm the correctness of these views: "The legislature shall provide by law for the speedy publication of *all* statute laws, and of such judicial decisions made within the state as may be deemed expedient. And no general law shall be in force until published." The language is not that no general law shall be in force until published *in the manner prescribed by law.* Saying that general laws shall not be in force until published, is equivalent to saying that such laws *shall* be in force when published, whether the publication is made in the *precise manner* prescribed by the legislature or not. The section contains two entirely distinct provisions, the one mandatory only to the legislature, the other limiting its powers. Manifestly, if the framers of the constitution had intended that laws should not be operative until published in the manner the legislature should provide, they would have so said, and would not have left this provision, when interpreted by any proper rule of grammatical construction, to declare that all general laws should be in force when published, without any reference to the mode of publication.

I am utterly unable to see the force of the expression of the court, "We think the publication mentioned in the last clause of sec. 21, Art. VII, of the constitution, is the one required to be provided for in the first, that is to say, that it must be in pursuance of some law." The legislature shall provide for the publication of *"all* statute laws," whether local or general, private or public. "And no general law shall be in force until published." According to the logic of the expression, general laws may go in force by such publication as the legislature may provide for private and local laws which require no publication in order to their validity.

Can it be that the framers of the constitution were guilty of such folly? And by what process of logical deduction do we arrive at such a conclusion? The words, "in the manner prescribed by law," do not follow the provision concerning the publication of general laws. Why should this court interpolate them upon this constitution provision.

*A. D. Smith,* on the same side, examined the constitutional power to authorize the subscription for the railroad stock by the city of Janesville; also that the city was liable to pay these

Clark vs. City of Janesville.

coupons to these plaintiffs.   On that point he cited the follow-
ing authorities in addition to those given in the brief of Mr.
Ely :  *Mechanics' Bank vs. N. Y. & N. H. R. R. Co.*, 11 Paige,
634 ; S. C., 3 Kern., 599 ; *Delafield vs. State of Illinois*, 3 Hill,
159 ; *Gorgier vs. Mieville*, 3 B. & Cress., 45 ; *Lane vs. Smyth*,
7 Bing., 284 ; *Craig vs. City of Vicksburg*, 9 Am. R. R.
Times, No. 11, March 12, 1857 ; *Chapin vs. Vermt. & Mass.
R. R. Co.*, 20  Law  Reporter, 650 ; 20 How., 371 ; 18 N. Y.
Rep., 39.


*By the Court*, PAINE, J.   This case involves the validity of
bonds issued by the city of Janesville in aid of a railroad.
The question is justly deemed an important one, and has
given rise to much discussion, both in court and out.   It is
supposed to involve not only private safety, but the public
honor ; and appeals have been made on the one hand to pro-
tect tax payers from impending ruin, and on the other to
preserve the honor and good name of the state from the
blight of repudiation.   Appeals of this character can have no
weight with a judicial tribunal.   Not that courts cannot look
beyond the letter of a law in interpreting it.   Undoubtedly
they must construe it, as all written instruments are con-
strued, by the light of surrounding circumstances.   The ex-
isting condition of things, the evils to be remedied, the objects
to be attained, may all be looked at, and frequently require to
be looked at, with the closest scrutiny, and the clearest judg-
ment, in order to determine what the law is.   But beyond
that, courts cannot go.   They cannot turn aside from the con-
clusion to which such an examination leads them, either to
avoid one evil consequence or another.   It is the province of
the judicial mind, like the compass, to declare the true di-
rection of the law, without regard to whatever obstacles may
lie in the way.   It is for the legislative power, like the pilot,
to make such changes as may be made to avoid these ob-
stacles.

This action is brought upon the coupons. The bonds to which they were attached, as appears from the complaint, were issued in pursuance of an authority contained in the charter of the city of Janesville, by which the common council were empowered to submit the question to the voters; and if the vote was in favor of it, to issue the bonds in payment of its stock subscription to the railroad company.

The first objection taken relates to the regularity of the election. It is claimed that the complaint must show that every step was taken as required by law, preliminary to the issuing of the bonds. And it is then said that the notice of the election was not properly published, because it appears from the complaint that the ordinance which alone authorized the clerk to publish it, was first published in the same paper with the notice, and not being in force till it was published, could not have conferred any authority on the clerk to publish the notice. Conceding that it appears from the complaint, that both were published together, which I think does not necessarily appear, the objection is of too metaphysical a character to be established as a rule to govern the ordinary transactions of business. The ordinance authorized the clerk to publish the notice, and though it was not in force itself, until published, and though it was published at the same time with the notice, I have no doubt that its publication then rendered that of the notice legal and authorized. The authority to publish the notice existed simultaneously with its publication, and authorized it. And it would be proceeding upon too refined and technical principles, to hold such a publication unauthorized, because the ordinance was not yet operative when the clerk carried the papers to the printer.

But the true answer to this objection, and to all the others involving the regularity of the proceedings on the election, is that the city, after having issued the bonds, and after they have passed into the hands of *bona fide* purchasers for value,

cannot defeat an action upon them by showing such irregularities. This was expressly decided in the recent case of *The Commissioners of Knox County, Indiana, vs. Aspinwall et al.*, 21 How., U. S., 539. It was there held that statutes authorizing the issuing of such bonds are public statutes, and that purchasers are bound to know them, so far as to see that the authority existed; but that when they had found the authority, its exercise made dependent on an election held in pursuance of notice, they were not bound to inquire into the regularity of all the proceedings in the election. But the bonds being issued and purporting to be issued in pursuance of the law, they were entitled to presume that the preliminary steps had been taken. It was also held that the law itself made the board, who were to issue the bonds, judges of the fact whether the election had been properly held, and what was its result; and that their judgment upon these facts, though it might be reviewed in a direct proceeding before the execution of the power, yet it could not be reviewed after its execution, and the bonds had passed into the hands of *bona fide* holders, and certainly not in a collateral proceeding.

The case of the *Royal British Bank vs. Turquand*, 88 E. C. L., 325, referred to in this opinion, also fully establishes that the purchaser in such case, finding lawful authority to issue the bonds after certain preliminary steps, and finding the bonds issued, ought not to be held bound to inquire into the existence and regularity of those steps. I think this doctrine just and reasonable; and that this rule constitutes a proper limitation to the general rule that parties dealing with the officers of such corporations are bound to know that they have authority to act. This latter rule is undoubtedly necessary, for the proper protection of those whom such officers represent; but it should not be carried so far as to destroy the safety and rights of those who, with good faith and due diligence, deal with such corporations, and I think

this would be the result, if these bonds are invalidated for such reason. How could a purchaser inform himself with any certainty, whether every step in an election of this kind had been regular? It extends through the several wards of a city. The records of what is done are frequently imperfectly made, and those that are made, are imperfectly preserved; and sometimes no record at all is required. And where is he to stop? The records, even though entirely regular, and showing everything done as required, are not conclusive. It is the majority of the legal votes that determines the question; and this court has held, that in order to arrive at this, the parties may go behind the certificates, even when the right to the executive chair is in issue. Should the city then be allowed to defeat this action by showing that enough illegal votes were cast at the election to overbalance the majority? I think the same principle that would sustain these objections, of irregularity in the notices, &c., would go to that extent. And such a rule would destroy all safety in dealing with corporations. It seems to be contrary both to law and justice, that they should be allowed to hunt up hidden irregularities in their own preliminary proceedings, to defeat obligations which they were authorized to issue, and for which others have parted with their property. The particular character of this transaction, and the question whether the stock subscribed for is now valuable or worthless, or whether the policy of subscribing was wise or foolish, can have no legitimate influence in determining the rule of law that should be established upon this point. The same rule that should be applied if the bonds had been issued to build its public buildings, and had been sold at a premium, and the money used for the purpose, I would apply here. And I think in either case the city cannot defeat its obligation by showing irregularities in the election.

The effect of showing such irregularities in a direct pro-

ceeding by any person interested, to prevent the issuing of the bonds, is another question not presented here.

But it is objected that the R. R. company had no power or authority to receive this stock subscription by the city. The substance of this objection is, that this subscription by the city is not the kind authorized in the charter of the company, that the charter was still in force, unchanged, and that the charter of Janesville only authorized the city to subscribe, but contains no authority for the company to receive the subscription. This reasoning seems to me also of too refined and technical a character for practical purposes. I concede that the provisions of the company charter do not authorize it to receive subscriptions of this kind. But the power is clearly given by the charter of Janesville. It is a well settled principle, that a grant of power carries with it, as incidental, every thing necessary to its execution. Can it make any difference whether the thing necessary, implies an additional capacity in the one executing the grant, or in the one with whom, or the subject upon which it is to be executed? I think not. It is a question simply at to the intent of the legislature. They grant the city power to subscribe for the stock of the company, and give its bonds in payment. Did they intend that the company should have power to receive the subscription and issue the stock for the bonds? No one would seriously assert the contrary. Have they then employed the necessary language to show this intent? I think so, clearly, in granting the power to the city to give the bonds for the stock. This carries with it, by irresistible implication, the power to the company to give the stock for the bonds, and it would have been an idle repetition to have said it should have the power.

Suppose a law authorizing the issue of bonds by the state and providing that the Governor might negotiate them by indorsement; would it be necessary to say that they should be negotiable? Suppose a license required for marriage. If a

license says A may intermarry with B, is it also necessary to say that B may intermarry with A? When these shall be held necessary, then I shall think that, under a law authorizing a city to subscribe for the stock of a railroad company and deliver its bonds in payment, the company has no authority to receive the subscription or the bonds, but not till then.

But the principle objection is, that the state itself cannot, under the constitution, authorize a city, town or county, to loan its credit in aid of a railroad. In support of this position, sections 3 and 10, Art. VIII, are relied on. The first is, " The credit of the state shall never be given or loaned in aid of any individual, association or corporation." And the last, " The state shall never contract any debt for works of internal improvement, nor be a party in carrying on such works," &c.

It is said that cities, counties and town, are parts of the state, constituting its political divisions, and that as such, they come within the spirit and intent of these prohibitions; that for the state to authorize them to loan their credit in carrying on internal improvements, is to do indirectly what it cannot do directly; and that to sustain such a law, is to say that the state may grant to a part of itself, the power to do what the whole cannot, and that power may be derived from a source where it does not exist.

It is manifest that the whole question is, whether for a city, town or county, to loan its credit, is a loan of the credit of the state? Whether, if either became a party in carrying on works of internal improvement, that makes the state a party to such work? Clearly, they are not within the letter of the constitution. A city is not the state, neither is a town or county. The question then is, whether they are within the spirit of the provision? And it seems to me, beyond doubt, that they are not. On the contrary, these two

sections, like nearly all in Art. VIII, relate exclusively to the state, as a whole, and were not designed to regulate or limit the powers of counties, cities, or towns. This seems obvious on the slightest inspection of its provisions. Perhaps the first section, declaring that " the rule of taxation shall be uniform," might be held applicable to the taxing power delegated to these corporations. But I think there is no other section in the article that can have any application to them. Section 2 provides that " no money shall be paid out of the treasury, except in pursuance of an appropriation by law." But will it be said that this regulates the payment of money from the town, city or county treasury?. No one would pretend it. Section 4 says, " the state shall never contract any public debt, except in the manner herein provided." The manner therein provided is, that every debt shall be authorized by law, for some purpose distinctly specified, and shall be passed by a vote of the majority of the members elected, by ayes and noes. But cannot a county or a town contract a debt without going through this formality? No one will pretend the contrary. Yet is there not just as much ground to say that " the state," as used in sec. 4, includes these lesser corporations, as to say it in regard to the other sections?

Sec. 9 provides that " no scrip, certificate or other evidence of *state* debt whatsoever, shall be issued, except for such debts as are authorized by the sixth and seventh sections of this article." Are county, town or city orders, evidences of a " state debt," and the issuing them a violation of this section? It can hardly be necessary to give a serious answer to such a question. Yet I cannot see why the affirmative might not as well be asserted, as to sustain the construction attempted to be placed on sections 3 and 10. Other provisions of the instrument also show such a construction utterly untenable. Thus, while sec. 3 of this article prohibits the state from loan-its credit at all, yet section 3, of Art. IX, expressly recog-

.nizes the power of municipal corporations to loan their credit, and requires the legislature to properly restrict it.

The object of the prohibition in sec. 10, against the state contracting any debt for works of internal improvement, or being a party to carrying them on, does not require cities, counties and towns, to be included in the prohibition. The simple reason is, the object was only to prevent the state as a state, from becoming a party to such works, and not to prohibit the works from being carried on. It was simply a question how they should be carried on. The history of other states had shown, that for the state itself to engage in these works, involved it in difficulty and embarrassment, and that the works could be better prosecuted by private enterprise, assisted by such cities, counties and towns, as were in the vicinity of the improvement, and interested in its completion. Hence the constitution prohibits the state to become a party to such works, or to loan its credit, but contains no prohibition of a similar character with respect to these local corporations; and on the contrary, expressly recognizes their power to loan their credit, which must have contemplated their becoming parties in carrying on internal improvements, for it was for this purpose that this power in such corporations had been commonly exercised.

If this, then, is so; if the credit of a city is not the credit of a state, nor its debt a state debt, such acts are not liable to the objection of doing indirectly, what cannot be done directly. The thing that cannot be done directly, is to contract a state debt for works of internal improvement. If the legislature should attempt to authorize a city to contract a *state* debt for such works, that would be attempting to do indirectly what it could not do directly, as well as being a very great absurdity. But when it only allows it to contract a debt against itself, that is liable to neither objection. Nor is it liable to the logical objection of deriving power from a

source where it does not exist. The state may have power to grant a power, and at the same time not have power to execute it. This is clearly shown by reference to this very prohibition against its being a party in carrying on internal improvements. No one doubts that it may authorize a railroad company to build a railroad. But it could not build one itself. And is that deriving power from a source where it does not exist? Clearly not. Because the state has the power to grant the authority, and is prohibited only from being itself a party in its execution. The difficulty with this objection is, that it confounds the power of granting a right, with the power of being a party to its exercise; whereas the two are essentially distinct. This is illustrated by reference to the king's prerogative of granting offices. See Bacon's Abridgment, Title " Prerogative, E," where it is said: " The king cannot execute any office relating to the administration of justice, although all such officers derive their authority from the crown, and although he hath such offices in him to grant to others."

But it is said that the object of these provisions was to protect the citizens from taxation for purpose of internal improvement. If that could be assumed, I see not how the law can be sustained, for its result might certainly defeat that object. But I see nothing in the instrument, I know of nothing in the history of its adoption that I think could justify me in assuming such to have been its intention. Other states had been parties to such works, and the people had been subjected to the taxing power to carry them on. In other states, towns, cities, and counties had aided in such works, and their inhabitants had been subjected to the taxing power in consequence of it. These facts were well known and understood by the framers of our constitution, many of whom, if not all, had come from older states, where these things had existed. Now if they had intended to pro-

tect the people from the taxing power for internal improvements, why not say so ?  · Why not say that no citizen should ever be taxed for such purpose?   Why not say not only that the state should not be a party in carrying on such works, but that counties, cities, and towns, should not be ?   They knew that if the latter could be, the citizens might be taxed, and if the object was to prohibit such taxation, I cannot account for the entire failure, to use any language expressing it.  This objection would also assume that the state might be a party to these works, if it could do so without a resort to the taxing power, which would be clearly untenable.   I think therefore, when the constitution says the state shall not be a party in carrying on these works, it means simply that; and not that no citizen can ever be taxed to carry them on, which is a very different matter.   The fact, also, before referred to, that the constitution expressly recognizes the power of municipal corporations to loan their credit, and the fact that these loans had commonly been made in aid of such works, and that if made, the citizens may, in consequence thereof, be taxed, seem to me to show, conclusively, that it was not the object of the instrument to prevent the possibility of taxation for such purposes.

But I think this whole objection is disposed of by the decision of this court in the case of *The State ex rel. Dean vs. The City of Madison*, 7 Wis. Rep., 688.   It involved the validity of bonds issued by that city for public purposes.   And it was claimed to be a violation of sec. 6, Art. VIII., of· the constitution, which prohibits the state from contracting debts to exceed one hundred thousand dollars.   It was held that this provision related to the debts of the state as such, not to those of its towns, cities, &c.   If it be said that to allow these corporations to engage in such works, and to tax their citizens therefor, may result in as great abuses and evils as for the state to do it.   This may be conceded, but it does not

change the argument. The answer is, that even though it be so, the language of the constitution does not include these evils in its prohibition. As to them, it refers it to the legislature to adopt such restrictions as may be necessary to prevent them. In such restrictions, therefore, and in the wisdom and integrity of the people who act for themselves in administering the affairs of these corporations, is to be found the only remedy for such abuses. The constitution has not deprived them of the power.

- But it is further said, that the building of a railroad is not a municipal purpose; and that, therefore, this act is invalid within sec. 1 Art. XI., which is as follows: " Corporations without banking powers or privileges, may be formed under general laws, but shall not be created by special act, *except for municipal purposes,* and in cases where, in the judgment of the legislature, the objects of the corporations cannot be attained under general laws." This language is construed as a prohibition against investing a municipal corporation with authority for any purpose, except a municipal purpose. I do not so understand its object or effect. It seems obvious, on the face of the provision, that it is aimed at the evils of special legislation. The prohibition is against creating corporations by special act. From this prohibition certain kinds of corporations are excepted, among which are those for municipal purposes. The exception relates to the kind of corporations that may be created by special act, not to the purposes for which it is possible to invest a municipal corporation with authority. The question whether it is competent to give such a corporation, already in existence, authority for a purpose not strictly municipal, is not within the language of the clause, and obviously not within its scope or object. It is doubtful, also, whether this clause can, at best, be regarded as anything more than directory to the legislature, as it leaves the whole matter, after all, to its judgment.

Clark vs. City of Janesville.

Neither am I certain that I should not hold the aiding of a railroad to be a municipal purpose, if I deemed that question necessary to be determined. I am aware there is a conflict of authorities on the point. But I think there is great force in the reasoning of those who hold that the general welfare, and commercial prosperity of cities, are so materially advanced by connecting themselves with one of these great arteries of trade and travel, as to make their construction a legitimate object of municipal enterprise. The fact whether the improvement extends beyond the limits of the corporation is sometimes made the test. But this is not entirely satisfactory to my mind. I can see no difference in principle, whether Milwaukee issue its bonds to build a harbor entirely within its own limits, but designed to open its marts to the commerce of the lakes, or whether Janesville, or any inland city, issue its bonds to build a railroad, extending beyond its limits, but designed to connect itself with that same commerce. The object is the same, the result on the prosperity of the city the same in both cases. But I shall not pursue this question, as I deem it unnecessary to a decision. I have thus referred to the objections to the validity of these bonds, with one exception; and were these the only objections, I should be prepared without any doubt on the subject, to affirm the judgment.

But there is one other, which though not urged by the counsel for the city, was yet discussed at length by the counsel for the plaintiff, and which, it seems to me, is necessarily involved in the case. That is, whether the charter of the city of Janesville, which authorized the issuing of these bonds, is a general law within the provision of the constitution, that such laws shall not be in force until published and if so, whether it was in force when they were issued.

In the Iowa county seat case, decided at this term, 9 Wis. Rep., 279, we held that a law providing for submitting to the

people of that county the question of a removal of the county seat, was a general law, within this provision of the constitution. And the decision was placed partly upon the general public interest in the question involved, and partly on the fact that the act incorporated into itself the provisions of the general election laws, whereby any inhabitant of the state going into that county and illegally voting at the election would have been liable to punishment. In that opinion reference was made to several decisions in regard to public statutes. And it was said that we had no doubt the words, "general law," as used in this clause of our constitution, were intended to include the same kind of laws as the words "public acts," used in the laws and decisions referred to. The counsel for the respondent did not deny that the charter of Janesville was a public act, and this could not well be denied. In addition to the important bearing that such a charter has upon the interests of all inhabitants of the city, it also organizes a new political division of the state; it delegates a portion of the legislative power, and authorizes the common council to enact ordinances, having the force of laws, by which all the people of the state coming within their jurisdiction are to be governed, and are subjected to arrest, trial, and punishment. It provides for the collection of a portion of the state revenue, and incorporates into itself the general election laws, laws relating to the injury of bridges, &c., which apply as well to all the people of the state who should go there and violate them, as to those residing in the city; and the clear proceeds of the fines and penalties, collected under the ordinances of the city, or for violations of these general laws re-enacted in the charter itself, would go into the school fund, under the constitution, for the benefit of the whole state. It is indisputably a public act within all the authorities upon the subject. But the counsel for the respondent contends that there is a distinction between a public act

Vol. X.                    12

and a general act; that all public acts are not general; and that the remark in the Iowa county case, that the words "general law" were designed to include all public acts, was too broad. There was nothing in the discussion in that case that suggested the distinction here claimed, and in such examination as I then gave it, no reason for it occurred to me; but if it exists, if that remark was *too broad*, and overlooked this distinction, I, for one, should not hesitate a moment so to declare.

But since the discussion of this case, I have carefully re-examined the question, and my opinion remains unchanged. I find that from the earliest times, the words " public" and "general," as applied to statutes, have been used as convertible terms. In Holland's case, Coke, pt. IV, 75, the question was whether the act involved was a public act, such as the court should take notice of. It is called " a general law, throughout the case. In the notes referring to other cases on the same question, statutes are spoken of as " public " and " private." In *Samuel vs. Evans*, 2 T. R., 569, the act in question is said in the head note to be a "public act." In the arguments of counsel, the decisions upon it are presented. Several of the judges had held it to be " a general law;" others, " a private law." And throughout the case, the words *general* and *public* are used as synonymous. Chancellor Kent, in his commentaries, Vol. 1, 506, classifies all statutes as " public or private;" and he says, " the most comprehensive, if not the most precise definition in the English books is, that *public acts relate to the kingdom at large.*" This is the precise definition claimed by the counsel for a general law, and is inconsistent with the distinction he asserts ; for he was compelled to concede, that acts may be public which do not act territorially thoughout the state, if they are of general importance in their effect upon the interests of the people. And if such acts may be said to " relate to the kingdom at

large," they fully come up to the idea of a general law; and so Kent says on the next page; "public statutes" are "a part of the general law of the land," &c. Again, in Stephen's commentaries, vol. 1, p. 67, he classifies statutes as "either public or private;" and he says, "*a public act is a universal rule, that regards the whole community.*" Both of these commentators evidently use the word public as synonymous with general.

So in Dwarris on Statutes, 629, it is said, "public acts relate to the kingdom at large;" and again, on 630, "a general or public act, then, regards the whole community;" using the words as synonymous; and also, "a private act, if recognized by a public act, must afterwards be noticed by the courts as a general law." In Sedgwick on Statutory Law, &c., p. 30, it is said the leading division of statutes is into "public or general, and private or special." And he then proceeds: "Public or general statutes are, in England, those which relate to the kingdom at large. In this country they are those that relate to or bind all within the jurisdiction of the law-making power, limited as that power may be in its territorial operation, or by constitutional restraints." So in Bonvier's Law Dictionary we find "public" or "general" statute defined. And this use of the word is in accordance with common understanding, and the definitions of standard lexicographers. Webster defines "general" as meaning, among other things, "public," "common," "extensive, though not universal," &c. So one definition of "public" is "general." But I will not quote further. I think I have already shown that the word general, as applied to statutes, has an established meaning, synonymous with the word public; and that is sufficient for my purpose.

But it undoubtedly has other meanings. It is used as contradistinguished from local, and then it would mean operating over the whole territory of the state, instead of in a particular

locality. It is used, also, as contradistinguished from special, and then it means relating to all of a class, instead of to one, or a part of that class. It has been used in the former sense in carrying out a more accurate and detailed classification of statutes. This is referred to in Dwarris, p. 629, where it is said that, "for convenience of citation," statutes have been further divided into "public general acts, and public local acts," &c. The word "general," here, is evidently used as the opposite to local, and the word public, used in connection with each, expresses the general character of the law, as distinguished from a private law.

Our own constitution furnishes an illustration of its use as the opposite to the word "special," in article XI, where it is said that corporations may be formed under "general, and not under special laws," except municipal corporations, which may be formed by special acts. It was assumed as very clear by other counsel, in the argument of another case, that an act organizing a municipal corporation could not, in view of this provision, be a general law, within the meaning of section 21, art. VII. He said it could not be special and general also. But I think this by no means follows. On the contrary, it is demonstrable that an act may be special, that is, relate to one of a class, and at the same time general, that is, of such extensive and general interest as to be a public law. Suppose an act organizes a judicial circuit; it is a special act; it relates to a judicial circuit, but not to all. But it will not be disputed that it would be a public act; and if public, then in the sense hereinbefore shown, general.

The word *general* in Art. XI, §§ 1 and 4, is clearly used only as opposite to *special*, and without any design of indicating the public or private character of the law. The evil aimed at was special legislation, and the whole object and scope of the provision shows that the word general, as there used,

was confined to its restricted meaning as the opposite of special.

The question then presents itself, in what sense was it used in sec. 21, Art. VII, where it is said, " no general law shall be in force until published?" It is not used here in connection with the word " local" or " special." There is nothing in the context showing that it was used as contradistinguished from either. Among its various possible meanings, resort must be had to the object of the provision, to determine in what sense it was used. And the moment that is looked at, it seems to me to leave no room for doubt that it was used in its usual sense when applied alone to a statute, that is as synonymous with public. The object of the prohibition was the protection of the people, by preventing their rights and interests from being affected by laws which they had no means of knowing. But all are bound by, and are bound to take notice of public statutes. It was conceded on the argument, and could not well be denied that a large class of statutes are public, having the most important bearing upon the interests of large portions of the people, which are yet local in their immediate operation. If all these are excluded it is manifest that the object of this clause of the constitution is in a great measure defeated. And the people are liable to act blindly with reference to their most important interests, and to have their rights sacrificed by the operation of laws which they are bound to know, but have no means of knowing. Such a result is in conflict with the first duty which a state owes to its people. That the object of this prohibition was to prevent it I have no doubt. The language used is not only capable of a construction which will accomplish the object, but such is in accordance with its usual meaning, when used alone, as it is here, and not in connection with other words which may give it a more restricted sense. The question then is, shall it be construed in its usual meaning, and according to its obvious in-

tent, or shall the court go beyond this provision and search out a more restricted sense in which the word is sometimes used, and upon that verbal pretext, limit its meaning here, so as to defeat half the object of the prohibition, for the sake of avoiding whatever consequences may result from its enforcement? For one I must adhere to the former course whatever may be the result.

It was argued as though the whole distinction between public and private acts was founded on a mere convenience in pleading, and as though acts were public because courts take notice of them. But the distinction rests upon a much more essential and important principle, and not only courts, but every body, are bound to take notice of them, because they are public acts. The fact that the legislature sometimes declares that a private act shall be deemed a public act and taken notice of by the courts, was supposed to have some bearing on the question. But I am unable to see it. Undoubtedly the legislature may, as a mere matter of convenience, provide that a private act shall, in some respects, be treated as a public act. But the constitution proceeds upon the essential characteristics of the acts themselves. And clearly, the legislature could not, by merely changing the name of an act, take it out of or bring it within the constitutional provision contrary to its essential character. But as no such question is presented, I can see no bearing which the common practice of saying that a private act shall be deemed public, has upon the question at issue.

I am compelled, therefore, to hold that the charter of the city of Janesville was a general law within the meaning of this prohibition of the constitution, and that it could not be in force until published. But it was also held in the Iowa county seat case that the publication which is to give force to a general law, must be one made under some provision of law. Not that the precise manner or time should be observed, but

that it must be done under the law and by authority. And this position has also been assailed. And it was contended that any publication, such as reasonably notified the people, should be held to make the law operative, even though entirely without authority. But I cannot assent to such a position. On the contrary, I repeat what I said in that case, that where the constitution requires provision to be made by law for the publication of all laws, and then immediately says that " no general law shall be in force till published," it seems to me the publication mentioned in the latter clause, is obviously the one required to be provided for in the first. And no other rule is practicable. Courts and people are bound to take notice of general laws; and that upon which their operation depends, should be capable of being readily ascertained with the highest certainty. This can only be done by having it an authorized act, and the evidence of it preserved in pursuance of law.

It is said by counsel in his brief, that this charter was published in the newspapers at Janesville. But it is not pretended that there was any law authorizing it. And how is the court to know the fact? Is it to inspect all the newspapers in the state to know whether some individual has caused laws to be published? Is it to inquire whether they have been published in handbills, or in pamphlets? Is it even to inspect the newspapers of other states, some of which are extensively circulated here, to see if our laws have been published in them? And, even if they should be found printed in this way, how are the courts, or the people, to know that they are the laws? They would not come through an authentic channel of information, and it could only be known after all, that they were laws, by resorting to such channel. But it seems to me too clear to admit of doubt, that the publication which is to make a law operative, must be authorized by law. And I think there is no weight in the suggestion that, under this

rule, no general law could ever have got into operation, for the reason that, until the first law was published, there would be no law authorizing its publication. This is the same objection made to the validity of the ordinance before noticed, and the same remarks apply to it. If a general law is enacted, and itself prescribes the manner of its own publication, if published accordingly, I should have no hesitation in saying that the publication was in pursuance of law. The publication would give validity to the law, and the law would give authority to the publication.

The charter of the city of Janesville was published among the Private Laws of 1853. The certificate of the Secretary of State attached to the volume, as required by law, is dated on the 4th day of October of that year. And we have held, at the present term, that, in the absence of any suggestion to the contrary, we should take the date of that certificate as the time of the publication. There is no claim that this charter was published by authority before that.

The election was held upon the question of subscribing stock in July, and the bonds and coupons were issued on the first day of August in that year. It was all done, therefore, without any law authorizing it; and within all the authorities is invalid. In *The commissioners of Knox County vs. Aspinwall,* before cited, the Supreme court of the United States say: " The act in pursuance of which the bonds were issued is a public statute of that state, and it is undoubtedly true that any person dealing in them is chargable with a knowledge of it; and as this board was acting under delegated authority, he must show that the authority has been properly conferred," &c.

Here the authority fails, and the bonds were issued without law. And, for this reason, though regretting the necesity of deciding a case of so much importance upon such a ground, I think the demurrer should have been sustained,

and that the judgment of the court below must be reversed, with costs.

Dixon, C. J. I fully concur with my brother Paine.

Cole, J., dissenting. The constitutional questions presented by this record are substantially the same as those involved in the case of *Bushnell vs. The Town of Beloit,*\* upon which I have expressed my views, in the opinion in that case. I have but little to add in the present case further than to observe that, to my mind, the argument in favor of the validity of the bonds mentioned in the complaint, and of the power of the legislature to authorize municipal corporations to make subscriptions to the capital stock of rail roads, in which the corporation may be interested, is greatly strengthened by the language used in section 3 of Article XI. of the constitution. By this section it is made the duty of the legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses; thus recognizing in the clearest manner that a power may be conferred upon these corporations to borrow money, contract debts, and loan their credit for some lawful purpose. And if the inquiry is made for what purpose municipal corporations have found it necessary to borrow money and loan their credit, it cannot be said that it has been to defray the ordinary expenses of the local government. These expenses are almost invariably met by direct taxation upon the property within the corporation; or at least it is from this source that the revenue is generally derived. When, therefore, municipal corporations have loaned their credit, it has been done for the purpose of aiding some individual association or cor-

---

\*See this case below.

poration in constructing some works, or making some internal improvements, calculated directly or indirectly to benefit the city. It is for the accomplishment of objects of this character that municipal corporations have found it necessary to loan their credit and borrow money, and this was well understood by the framers of the constitution. And, since municipal corporations derived the power from the legislature to loan their credit for these purposes, the duty was enjoined upon the legislature in conferring the power so to restrict it as to prevent any abuse in its exercise. The power must be conferred in some degree before it could be restricted in any. But that it was not intended by the framers of the constitution to deprive the legislature of the power to authorize municipal corporations to aid in carrying on works of internal improvement, but to permit that authority to be granted, under such restrictions as to the legislature might seem proper, would seem to follow, in the clearest manner, from the language employed in this section. And in conferring upon the common council of Janesville power, by resolution, to authorize the mayor to subscribe stock for "any rail road running to or passing through the city," the legislature undoubtedly supposed that the limitations upon this power contained in the charter would effectually prevent any abuse in its exercise. The common council, in the first instance, had to submit to the legal voters of the city the question whether the city should take stock; giving at least ten days notice, in some newspaper published in the city, of the time and place of voting upon the question, stating the amount to be subscribed, &c. The election was to be by ballot, and if a majority of the votes cast upon the question was in favor of taking the stock, the common council, by a resolution which was required to be entered upon the city records, could authorize the mayor to subscribe for the city the amount of stock so voted to be taken. And as the concurrent action of

the city authorities and people was necessary to authorize the subscription, it was but fair to suppose that no abuse would follow from conferring this power upon the corporation. The power to take the stock was subject to the will of the people directly affected by the indebtedness; and this was all the restriction the legislature deemed necessary to impose upon its exercise in the present instance. But the legislature must grant the power to municipal corporations to contract debts and to loan their credit before it could restrict or regulate the power conferred.

And without pursuing this line of remark further, I will only add, that it is apparent, as well from the clause of the constitution I am now considering as from the whole scope and spirit of that instrument, that the legislature were not inhibited from authorizing the authorities of the city of Janesville to make the subscription to the capital stock of the Rock River Valley Union Railroad, and to issue the bonds in controversy.

It was likewise insisted upon the part of the appellant, that the ordinance passed by the common council of the city, did not properly fix the place for submitting the question of taking stock to the legal voters of such city, and that due notice of the election was not given, &c. Upon an examination of the allegations of the complaint, I am not able to discover, but that the requirements of the charter in reference to holding the election, were substantially complied with, and the election appears to have been regularly and fairly conducted. At all events, if there were any irregularities in the proceedings preliminary to the issue of the bonds, I do not think any of those relied upon by counsel, are of such a character as ought to invalidate the bonds in question in the hands of an innocent holder for value. It is well known that bonds of this description are intended to be thrown into the market and sold, and it would be an inequitable rule to hold that

they were void in the hands of a *bona fide* purchaser, on account of some defect in the notice of election, or some slight irregularity in conducting the same. See *Commissioners of the County of Knox vs. Aspinwal et al.,* 21 How. U. S., 539; *Fisher vs. The Morris Canal Banking Company,* 1 Stock, Ch. 667; *Mechanics' Bank vs. New York and New Haven Railroad,* 3 Kernan, 599; *The City of Bridgeport vs. The Housatonic Railroad Company,* 15 Conn. 475.

These cases clearly show what character has been given to this class of securities, and how far courts have gone in excluding defenses, where the suit was not between the orginal parties, which was grounded upon some defect in the notice of, or some alleged irregularity in the issue of the bonds. It is true, that the right of the common council to authorize the mayor to subscribe the stock, depended entirely upon the fact that a majority of the legal votes cast at the election, should be in favor of the subscription, but it is not to be presumed that the city authorities did not proceed according to law in ascertaining the will of the people upon the subject, and did not comply with the provisions of the charter authorizing the election. The complaint in the present case sets forth, with great fullness, the preliminary steps which were taken, and I cannot perceive but the city authorities substantially complied with the conditions to the grant of power to subscribe the stock.

The question was likewise made as to whether an action could be maintained upon the coupons described in the complaint, because the bonds to which they are attached are not drawn payable to bearer or order, but to the railroad company or its assignees. The bonds were assigned by the president of the company to ———— or bearer; and the coupons are made payable to the railroad company or bearer. These securities are of a peculiar character, designed to be thrown into the market for sale, to raise money upon, or to

pass from hand to hand by delivery, and by common usage, are, in fact, so transferred. Though they may not be commercial paper, in the strict sense of the word, like bills of exchange, or promissory notes, yet they circulate in market much like those instruments, and are intended to answer much the same purpose. They can be transferred by delivery or assignment, so as to confer a complete title upon the holder, relieved from the equities existing at the time of the assignment, between the maker of the instrument and the assignor. *Morris Canal and Banking Co. vs. Fisher; Mechanics' Bank vs. New York and New Haven Railroad Co.; supra.*

In the case of *The Commissioners of Knox Co. vs. Aspinwall,* the court decided that a suit could be maintained upon the coupons without the production of the bonds to which they had been attached.

Although this action is brought to recover the amount due upon the coupons set forth in the complaint, still it appears that the bonds to which the coupons in question are attached, belong to the respondents. And under the provisions of our code, § 15, which requires every action to be prosecuted in the name of the real party in interest, I cannot doubt but that the respondents, to whom the bonds and coupons belong, properly instituted this suit, and are entitled to recover the amount due upon the coupons. See *Wookey vs. Pole,* 4 B & Al. 1; *Gorgier vs. Mierrile,* 3 B. & C., 45; *Lang vs. Smyth,* 7 Bing., 284.

Neither do I see any force in the objection that the subscription by the city for the stock of the company, was not made payable in installments, upon call, as required by section 6 of the charter of the railroad company. The city was, undoubtedly, authorized to make the subscription in the way it was made, and it would seem logically to follow from this fact, that the company was authorized to receive such

subscription.   At all events, if the charter required any modification to enable the company to make the contract, such modification was made by the city charter, which is full and complete for all purposes.   *The City of Bridgeport vs. The Housatonic Railroad Company*, 15 Conn., 475.

Some further objections are taken to the validity of the bonds mentioned in the complaint, but I only deem one of sufficient importance to be noticed, and that is, whether the charter of the city of Janesville is a general law, within the meaning of the constitution of this state.   It appears that before there was any authorized publication of the charter, the city government of Janesville was organized, and the election was held, at which the electors voted in favor of the common council making the subscription to the railroad stock, and for issuing these bonds; and it is contended that as the charter was a general law, it was not in force until published, and the subscription and election were unauthorized and void for this reason.   The majority of the court have adopted this view of the character of the city charter, holding it to be a general law, and not in force until published, and from their conclusions upon this point, I am compelled to dissent. Where the act, in pursuance of which the bonds are issued, is a public statute of a state, I have no doubt but that any person dealing in them is chargeable with knowledge of it, and must take notice, whether the authority to subscribe the stock has been conferred.   In this case the common council were acting under the city charter, and if that was not in force, it follows, of course, that their power to act did not exist.   It is obvious that the question is not whether an irregularity has intervened in the exercise of the power to subscribe the stock, but whether any power, in fact, existed to make the subscription.

Is, then, the charter of the city of Janesville a general law, within the meaning of section 21, of Article VII., of the con-

stitution of this state? That section reads as follows: "The legislature shall provide by law for the speedy publication of all statute laws, and of such judicial decisions made within the state, as may be deemed expedient. And no general law shall be in force until published." The argument mainly turns upon the force which is given to the words "general law," as used in this section. The majority of the court consider that the word "general," here employed, should have the signification and meaning as is given to the word "public," by authorities, when speaking of the classification of statutes. It is not to be denied, that many authorities use the words "general" and "public," when applied to statutes, as being synonomous, and strictly convertible terms.

In the case of *The State of Wisconsin, ex rel. Cothren vs. Lean*, decided at the last term, 9 Wis., 279, where the question raised was whether the act of the legislature, providing for the removal of the county seat of Iowa county, from Mineral Point to Dodgeville, in case a majority of the legal voters of the county voting upon the question, should be in favor of the removal, was a general statute, and we held that law to be a general law, and not in force until published. Although I concurred in the decision in that case, yet I had difficulty in arriving at the result reached by my brethren, and I am free to admit, that my doubts as to the correctness of that decision have been strengthened rather than removed by subsequent reflection upon the subject. It is by no means clear to my mind that the "general law" spoken of in the provision of the constitution above cited, is not a law which affects all the citizens generally, and operates territorially over the whole state. The law providing for the removal of the county seat of Iowa county, or the charter of the city of Janesville, is unquestionably a public act, expressly made so by a clause declaring them to be such.

But a distinction is made, and to my mind may well exist,

Clark vs. City of Janesville.

between public general acts, and public local acts. Smith, in his Commentaries upon Statute and Constitutional Law, § 797, p. 914, says: "In parliamentary language, another sort of distinction is also usual, and some acts are called public general acts, and often others, public local acts, such as church acts, canal acts, &c. These in their objects and operations, are merely local, or limited, but they are, nevertheless, treated as public acts, either by virtue of a special clause, declaring them to be so, or because, although limited to a particular section, or locality, yet they affect the public at large, when acting within that section or locality, in reference to matter within the purview of the act. To this class may also be added some acts which, though public, are merely personal, such as acts of attainder, and patent acts, and all that class of acts which have for their object the security of the right of some particular individuals or class of persons, but which, in effect, are operative and of binding force upon all the citizens generally." The distinction here pointed out is, to my mind, rational and proper, founded in the nature of things, and I think should be adopted. Particularly do I deem it applicable to the laws of this state, when we bear in mind the construction placed upon this clause of the constitution by the legislature, and the officers of the government, in the classification and publication of the statutes, since the organization of the state government. The legislature provided, § 2, sub-division 22, chap. 4, R. S., 1850, that all acts of incorporation shall be deemed public acts, and as such may be declared on, and given in evidence without especially pleading the same; and as a matter of fact, most of the acts passed by the legislature contain a clause declaring that they shall be deemed public acts.

Further, in conformity to law, the statutes have for some years been published in two volume; those of a general nature in one, and those of a local character in another. And

although the latter class have mostly been declared to be public acts, still the understanding of the officers and people of the state has been that they were not general laws, which came within the provisions of the constitution. Hence cities and villages have been organized, officers elected, taxes levied, real estate purchased and conveyed, and other obligations incurred, before there was any authorized publication of the acts of incorporation. Now if all these statutes, which elementary writers and courts have declared to be public laws, are held to be general laws within the meaning of the constitutional provision, and were not in force until published in some authorized manner, it is difficult to foresee the confusion which will arise, or the serious consequences which will follow from such a construction.

But there is another clause of the constitution which has a very important bearing upon this question, and shows most conclusively to my mind, that the charter of the city of Janesville is not a general law, within the meaning of that instrument. I refer to section 1, Art. XI, which reads as follows: " Corporations without banking powers or privileges, may be formed under *general laws*, but shall not be created by *special act, except for municipal purposes*, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws or special acts, enacted under the provisions of this section, may be altered or repealed by the legislature at any time after their passage." This is the whole provision, and it seems to me little more need be said to show that a charter of a city is not a general law, than to quote this language. The section declares, in substance, that corporations shall be formed under general laws, except those for municipal purposes, which may be created by special act. But what is understood by the language, a municipal corporation created by a special act? What is the special act referred to? Is it anything different

Vol. X.                    13

from a city charter? Does not the special act here referred to, mean those laws of incorporation granted by the legislature to villages and cities for police and governmental purposes? Is not this the plain, obvious, universal understanding of the language? These questions suggest their own answers. The framers of the constitution, then, evidently contemplated that municipal corporations would be created by special act, in other words, by charters. General acts might be passed, applicable to all villages, and cities, like the general banking law, or plank road law, but it was doubtless supposed that there might be some details or some peculiar provisions which could not be well comprehended in a general law, and that special acts of incorporations would therefore become necessary. Hence the exception that charters or special acts of incorporation for municipal purposes might be passed, and those special acts are spoken of in this section, and placed in immediate connection with, and are used in direct contradistinction to the general laws mentioned in the same section. If a city charter is held to be a general law, then it is difficult to give this section any rational construction. I am not aware that there are peculiar provisions in the charter of the city of Janesville, which distinguish it from other city charters in this and other states. It is quite probable that it differs in some unimportant particulars, but the main, leading features of these city charters are the same. I have no doubt, but it is substantially such an act of incorporation as the framers of the constitution had in view when they speak of special acts in this section. It is the special act "creating a corporation for municipal purposes," which the legislature was authorized to pass.

Holding, therefore, that the charter is not a general law within the meaning of the constitution, the clause in reference to the publication of general laws does not apply to it. I have no doubt but that the organization of the city government of

Janesville, and the election held under the charter, at which the people voted in favor of the common council making the subscription and issuing the bonds in controversy, were all regular and proper.

I therefore think the order of the circuit court, overruling the demurrer, should be affirmed.

